**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **VINCENT D. DIFELICE, on behalf of** | ) | |
| **himself and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:05cv750** |
| | ) | |
| **FIDUCIARY COUNSELORS, INC.,** | ) | |
| **f/k/a AON FIDUCIARY** | ) | |
| **COUNSELORS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

At issue at the threshold dismissal stage in this breach-of-fiduciary-duty action brought

pursuant to § 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1132(a)(2), is the nature of an independent fiduciary's duties to the participants in a

401(k) retirement plan. Specifically, this case considers whether defendant Fiduciary Counselors,

Inc. ("Fiduciary Counselors") acted in conformity with ERISA's standards of fiduciary conduct

after it was appointed to manage pension investments in a company's stock shortly before the

company's bankruptcy filing.

**I.**[1]

Plaintiff, Vincent D. DiFelice, is a mechanic employed by US Airways since January 3,

---

[1]Because the motion at bar is a motion to dismiss for failure to state a claim on which
relief can be granted, the facts recited here are derived from plaintiff's complaint. *See Randall v.
United States*, 30 F.3d 518, 522 (4th Cir. 1994) (plaintiff's version of facts accepted as true at
FED. R. CIV. P. 12(b)(6) stage).

1990 and a participant in the US Airways, Inc. 401(k) Plan (the "Plan").  US Airways, Inc. ("US

Airways") is a major domestic commercial airline and a subsidiary of US Airways Group, Inc.

("US Air Group").  On June 27, 2002, in consideration of the possible bankruptcy filing of US

Air Group and its subsidiaries, US Airways appointed Fiduciary Counselors, known as Aon

Fiduciary Counselors, Inc. during the class period, as an independent fiduciary with

responsibility for managing certain Plan investments.

The Plan was created on September 1, 1988 by US Airways, Inc., to provide retirement

income to certain of its employees.  Plan § 1.1.  The Plan allowed eligible employees to

contribute a portion of their compensation to their individual retirement accounts, and provided,

in certain circumstances, for matching contributions to be made by US Airways.[2]  Under the Plan

US Airways was designated as the Plan administrator with responsibility for selecting the

investment funds available to participants.  Plan §§ 7.1, 13.1.  The Plan also specifically allowed

US Airways to remove any fund as an investment option.  Plan § 7.2  Participants allocated their

contributions among the funds selected by US Airways in 5% increments.  Plan § 6.1.  If a

participant failed to make an election, the Plan provided that "his contributions shall be allocated

among the Investment Funds as directed by the Company."  Plan § 6.1.  The available investment

options during the time period at issue included a fixed income fund, certain diversified total

return mutual funds or diversified stock mutual funds, and the US Airways Group, Inc. Common

Stock Fund ("Company Stock Fund").

---

[2]Because plaintiff's Amended Complaint refers extensively to the Plan, it is appropriate to consider the Plan and its provisions when ruling on the motion to dismiss, and doing so does not convert the motion into one for summary judgment.  *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 623 n.4 (E.D. Va. 2000).

The Company Stock Fund was a unitized fund that consisted primarily of the publicly traded shares of US Airways Group, Inc. ("US Air Group"), the parent company of US Airways. The remainder of the Company Stock Fund's assets were held in cash.  It its role as Plan administrator, US Airways, together with the Plan directed trustee, Fidelity Management Trust ("Fidelity"), set a cash target range for the Company Stock Fund of 10%.  As a unitized fund, the amount of cash held by the Stock Fund varied daily based on several factors, including (i) the targeted liquidity levels established for the fund, (ii) participant activity in the fund (contributions, redemptions, exchanges, withdrawals, etc.) and (iii) variations in the price of US Air Group stock.  Fidelity was charged with buying or selling shares of US Air Group in order to keep the amount of cash in the fund within one percent of the target range.  The value of an investment in units of the Company Stock Fund was therefore primarily a function of the value of the underlying shares of US Air Group and to a lesser extent, a function of the amount of cash held in the Company Stock Fund.

US Airways remained responsible for deciding whether to retain the Company Stock Fund as a Plan investment option until June 27, 2002 when it appointed Fiduciary Counselors as the independent fiduciary with responsibility for making all investment decisions regarding the Company Stock Fund.  For several years prior to this appointment, the financial condition of US Airways and its parent company US Air Group had been weakened by a combination of competitive pressures, a high cost structure, and the terrorist attacks of September 11, 2001.  This combination ultimately resulted in the bankruptcy of US Airways and US Air Group.

In the year 2000, US Airways' business was suffering from the combination of a generally weak economic environment, and competition from both low-cost airlines and the

-3-

larger network carriers.  These factors would result in operating losses for the fiscal year 2000 of

$350 million and $270 million respectively for US Airways and US Air Group.  In an attempt to

reverse US Airways' flagging fortunes, management had executed a tentative merger agreement

on May 23, 2000 with UAL Corporation ("UAL"), United Airlines, Inc.'s parent company that

would have consolidated the two airlines.  The proposed merger, while well-received by the

stock market, did not stem the mounting losses.  In the first quarter of 2001, while the merger

was still pending, US Air Group reported an operating loss of $228 million, or nearly as much as

its total loss the prior year.  US Airways Chairman Wolf acknowledged before the Senate

Judiciary Committee that bankruptcy and discontinuing operations were "real threats" should the

merger with UAL not be consummated.  In fact, on June 27, 2001, US Air Group was forced to

terminate its proposed merger when the U.S. Department of Justice ("DOJ") announced its

intention to file suit to block the proposed merger due to antitrust concerns.  US Airways was

thus deprived of its primary long-term strategy, and forced to attempt to resolve its business

problems alone.

This already dire situation was dealt a further blow by the terrorist attacks of September

11, 2001.  In response to the attacks, the Federal Aviation Administration grounded all civilian

aircraft for three days.  In addition, Ronald Reagan Washington National Airport, particularly

important to US Airways' business, was closed until October 4, 2001.  US Airways President and

CEO David Siegel would later describe the impact of September 11 to his employees in the

following terms:

> While all airlines are contending with the business fallout from September 11,
> economically, US Airways has been the hardest hit.  The post-September 11
> reluctance to fly has been most pronounced on the East Coast, where most of our

> flights are concentrated.  US Airways was most heavily impacted by the
> prolonged closure of Reagan Washington National Airport.  Additionally, we're
> the only airline that has to compete not only with big competitors and low-cost
> carriers, but also with cars and trains.  The end result is that the events of
> September 11 and the ensuing deep-rooted changes to our industry have put into
> jeopardy the short- and long-term financial health of US Airways.

US Airways' continuing problems were recognized by debt rating agencies and the business press as well.  Moody's Investors Service downgraded US Airways' senior secured debt from "B1" to "B2" with a negative outlook rating.  Standard and Poor's likewise downgraded US Airways' debt from "B" to "CCC+" indicating that US Airways would be unlikely to have the ability to pay the debt in the event of adverse business, financial or economic conditions.  Similarly, a September 21, 2001 article in the *Wall Street Journal* described US Airways "as one of the two or three most likely [airlines] for seeking bankruptcy-law protection soon."  These problems were reflected in the stock market valuation of the airline.  On September 27, 2001, US Air Group Stock closed at $4.10 per share, representing a 65% decline from its pre-September 11 price.

US Air Group would ultimately record $2.12 billion in net losses in the year 2001, $1.86 billion of which was attributable to its subsidiary US Airways.  US Air Group acknowledged in its annual report that it expected these losses to continue at the rate of $3 million per day through the first quarter of 2002.  In its Form 10-Q filing for the quarter ended March 31, 2002, US Airways acknowledged the possibility of a bankruptcy filing should it fail to obtain sufficient government loans, and employee concessions.  This possibility became increasingly more likely throughout the spring of 2002 as US Airways financial situation further deteriorated.  To advise it in its restructuring activities, including the preparation of a possible bankruptcy filing, US

Airways hired the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps") on April 16, 2002.  On June 24, 2002, US Airways publicly announced that it would defer certain debt payments, chiefly those owed to aircraft lessors.

A bankruptcy filing was not, however, a foregone conclusion.  In an attempt to avoid bankruptcy, US Airways had completed its application for government loan guarantees by June 28, 2002.  Three days later US Airways commented on its federal loan application in the Plan's annual report, stating that:

> [l]oan approval is dependent upon, among other things, achieving the necessary cost reductions contemplated in the loan application.  Therefore, at this time, significant uncertainties exist regarding the Company's ability to reach an accord with its key stakeholders and whether or not the government will approve the Company's application for a guaranteed loan.

On July 10, 2002, the federal government approved US Airways' application for a $900 million loan, contingent upon US Airways' ability to secure concessions from labor, creditors, and lessors.

As it happened, US Airways was unable to secure these concessions, and on August 11, 2002, US Air Group and seven of its subsidiaries and affiliates, including US Airways, filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.  The New York Stock Exchange immediately suspended trading in US Air Group shares, and US Airways issued a bulletin warning its employees that investments in US Air Group stock were highly speculative.

The Company Stock Fund had remained a Plan investment option throughout the period preceding the bankruptcy filing.  Significantly, due in part to the combination of the 10% cash target range acting in combination with the steep decline in the price of US Air Group shares, the Company Stock Fund's percentage stake in US Air Group shares rose to roughly 33% of the total

number of US Air Group shares outstanding as of June 30, 2002.  Roughly 31% of these shares were held for the benefit of the Plan.  When US Air Group and its subsidiaries filed for bankruptcy, trading by Plan participants into and out of the Company Stock Fund was suspended.  By order of the bankruptcy court, the Plan fiduciaries were prevented from selling the Company Stock Fund's holdings of US Air Group stock without US Air Group's consent.  What little value that remained of the Company Stock Fund's holdings was eliminated by the bankruptcy plan reorganization.

US Airways had remained the Plan administrator with responsibility for selecting and terminating the investment options available to Plan participants until June 27, 2002 when it appointed Fiduciary Counselors as an independent fiduciary with responsibility for making investment decisions with respect to the Company Stock Fund.  This occurred approximately seven weeks prior to US Airways' bankruptcy filing.

The agreement between US Airways and Fiduciary Counselors set forth the following terms of the engagement:

Scope of the Engagement [T]he Independent Fiduciary shall be appointed as named fiduciary in the Company's stead with full authority and responsibility on behalf of each Plan to exercise all authority to:

(i)      Continue to offer the [Company Stock] Fund as an investment option under each such Plan on such terms and conditions as the Independent Fiduciary shall deem prudent and in the interests of the Plan and its participants and beneficiaries, including without restriction prohibiting or limiting . . . further purchases or holdings of Fund units or increasing the [Company Stock] Fund's holding of cash or cash equivalent investments; or

(ii)     Terminate the availability of the [Company Stock] Fund as an investment option on such terms and conditions as the Independent Fiduciary shall deem prudent and in the interests of the Plan and its participants and beneficiaries . . . .

The Agreement also granted to Fiduciary Counselors the authority to make communications to participants it deemed "to be necessary in connection with the exercise of its responsibilities" with the condition that those communications were "subject to [US Airways'] right to reasonable notice and opportunity to review and comment. . . ." The Plan and the Trust Agreement were accordingly amended to reflect Fiduciary Counselor's appointment as independent fiduciary.

In a letter dated June 27, 2002, US Airways informed Plan participants of the appointment of Fiduciary Counselors with authority to make investment decisions regarding the Company Stock Fund.[3] Under the subheading "Why appoint an independent fiduciary now?" the letter explained the following:

> President and CEO Dave Siegel has said on several occasions that we must restructure this Company either outside of a Chapter 11 reorganization or through a judicial restructuring. Our future path will clearly have an impact upon the value of US Airways common stock. The appointment of an independent fiduciary ensures that decisions regarding the US Airways stock held by retirement plans are made solely in the interests of plan participants and beneficiaries and avoids any real or perceived conflict of interest in connection with these decisions.

The letter further stated that US Airways believed the appointment of Fiduciary Counselors was "the most prudent course of action given our current challenges and the uncertainties facing us."

Pursuant to its authority, Fiduciary Counselors directed Fidelity to increase the cash target range of the Company Stock Fund from 10% to 20% effective June 27, 2002, and on July 3, 2002 directed Fidelity to cease purchases of US Air Group stock for the Company Stock Fund.

---

[3]The letter is attached as exhibit D to plaintiff's complaint and is therefore properly considered by the Court. *See* Rule 10(c), Fed. R. Civ. P. ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). *See also Davis v. Cole*, 999 F.Supp. 809, 812 (E.D.Va. 1998).

Fiduciary Counselors informed Plan participants of these directions in a letter received by

participants in early August.[4]   The letter further informed participants that:

> Over the next few months, we may also direct the Trustee to sell more shares of
> Common Stock than would occur automatically as a result of participant direction.
> Our authority further allows us to prohibit or limit additional purchases or
> holdings of units of the Stock Fund or even to discontinue the Stock Fund as an
> investment option available to you under the Savings Plan.  Pleas be aware that
> we may take these or other actions in the future that may affect the relative
> proportions of Common Stock and cash investments held by the Stock Fund as we
> deem prudent, without notifying you.

This letter represented the sole communication between Fiduciary Counselors and Plan

participants that occurred before US Air Group's and US Airways' bankruptcy filing.

In a letter sent to participants subsequent to the bankruptcy filing, dated August 13, 2002,[5]

Fiduciary Counselors explained that its decision to prohibit further purchases of US Air Group

shares was based on the fact that "US Airways had publicly announced that it might file

bankruptcy or take other actions that would reduce or eliminate the value of outstanding stock in

the Company."  Yet, apart from these public announcements, Fiduciary Counselors "had no other

advance notice of the timing of the bankruptcy filing."  Fiduciary Counselors stated that in its

capacity as independent fiduciary it had sold shares of US Air Group held by the Company stock

fund "to the extent that sales could be made without adversely affecting the market and the value

of the rest of the US Airways stock held by the [Company] Stock Fund."

In addition to market constraints, Fiduciary Counselors' ability to sell US Air Group

---

[4]This letter was attached to the complaint as Exhibit F and is thus properly before the
Court on the motion to dismiss. *See supra* note 3.

[5]This letter was attached to the complaint as Exhibit E and is thus properly before the
Court on the motion to dismiss.  *See supra* note 3.

stock out of the Company Stock Fund was constrained by the relatively small trading volume in

shares in relation to the substantial concentration of shares in the Company Stock Fund.  In

addition, Fiduciary Counselors was aware by July 2002 that SEC Rule 144 significantly limited

the amount of US Air Group shares Fiduciary Counselors could sell at one time.  This Rule

provides, in pertinent part:

> If restricted or other securities are sold for the account of an affiliate of the issuer,
> the amount of securities sold, together with sales of restricted and other securities
> of the same class for the account of such person within the preceding three
> months, shall not exceed the greater of (i) One percent of the class outstanding as
> shown by the most recent report or statement published by the issuer . . . .

17 C.F.R. § 230.144(e)(1)(i).  Fiduciary Counselors was also aware that these restrictions did not

apply to sales of US Air Group stock made at the direction of Plan participants.

This action was filed by plaintiff on June 27, 2005, pursuant to ERISA § 502(a)(2) on

behalf of the Plan to recover losses to the Plan which occurred as a result of Fiduciary

Counselor's alleged breaches.[6]  In a related suit, plaintiff had alleged breaches of fiduciary duty

by both Fidelity and US Airways.  Fidelity's subsequent motion to dismiss was granted on the

basis of its limited duties as a directed trustee.  *See DiFelice v. U.S. Airways, Inc., et al.,* ___

F.Supp.2d ___, 2005 WL 2386227 (E.D.Va. 2005).  US Airways' motion for summary judgment

---

[6]ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides that "a civil action may be
brought—by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief
under section 1109 of this title."  ERISA § 409(a), 29 U.S.C. § 1109(a), provides, in pertinent
part, that—

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan
> resulting from each such breach . . . .

ERISA § 409(a), 29 U.S.C. § 1109(a)

was granted with respect to plaintiff's claims that US Airways failed to provide participants

certain information, but denied with respect to allegations that US Airways failed to exercise the

prudence required of fiduciaries by ERISA § 404(a). *See DiFelice v. U.S. Airways, Inc., et al.,*

___ F.Supp.2d ___, 2005 WL 2674994 (E.D.Va. 2005). The present complaint alleges the

following breaches of fiduciary duty by Fiduciary Counselors:

    (i)      Failing to inform Participants that it had determined, on or prior to the inception of the Class Period, that Group stock was an imprudent investment;

    (ii)     Failing to close the [Company] Stock Fund to new investments;

    (iii)    Failing to inform Participants that market and legal restrictions prevented it from liquidating more than a small portion of Stock Fund's Group stock holdings at any given time;

    (iv)    Failing to timely inform Participants that it had instructed Fidelity Trust not to purchase additional shares of [US Air] Group stock for the [Company] Stock Fund or inform them that it had instructed Fidelity Trust to increase the cash target of the [Company] Stock Fund from 10% to 20%; and

    (v)     Failing to instruct Fidelity Trust to sell as much [US Air] Group as could be sold subject to market and legal limitations, rather than simply setting a 20% cash target.

Plaintiff alleges that these breaches resulted in losses suffered by the Plan. Fiduciary Counselors

has moved to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., arguing that plaintiff's Complaint

fails to state a claim as a matter of law.

## II.

    A motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., tests the legal sufficiency of

a plaintiff's claims, and should not be granted unless it appears that the plaintiff can prove no set of

facts that would entitle him to relief. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir.

1994); *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When reviewing a claim

under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations and construe

such allegations in the light most favorable to the plaintiff.  *See Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991).  Because the purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a plaintiff's claims, however, a court need not accept the legal conclusions a plaintiff draws from his factual allegations.  *See id.*

### III.

Before the plaintiff can state a claim for Fiduciary Counselor's breach of its fiduciary duty, plaintiff must demonstrate that Fiduciary Counselors is a fiduciary as that term is defined by ERISA.  *See Baker v. Kingsley*, 387 F.3d 649, 660 (7th Cir. 2004).  ERISA defines a fiduciary, in part, as one who "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets."  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Pursuant to its appointment, Fiduciary Counselors assumed US Airways role as the named fiduciary with respect to the Company Stock Fund with the authority to continue or terminate the Company Stock Fund as a Plan investment option and with the authority to alter the mix of cash and stock in the Company Stock Fund.  This authority clearly satisfies ERISA's requirements for fiduciary status.  *See DiFelice v. U.S. Airways, Inc., et al.,* ___ F.Supp.2d ___, 2005 WL 2674994, *12 (E.D.Va. 2005)

As an ERISA fiduciary, Fiduciary Counselors was bound by ERISA to exercise its authority with respect to the Plan "solely in the interests of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA § 404(a), 29 U.S.C. § 1104(a).  Because Fiduciary Counselors assumed US Airway's responsibilities as the fiduciary with control over the management of the Company Stock Fund, and because of the similarity between the claims against

US Airways and Fiduciary Counselors, the legal principles governing plaintiff's allegations are essentially the same. As was true of plaintiff's claims against US Airways, plaintiff's claims against Fiduciary Counselors fall into two general categories: (i) claims alleging the fiduciary's failure to inform plan participants, and (ii) claims alleging a failure to exercise prudence in the management of plan assets. *See DiFelice v. U.S. Airways, Inc., et al.,* ___ F.Supp.2d ___, 2005 WL 2674994 * 12-13 (E.D.Va. 2005). These two categories of claims are separately addressed.

## A.

Analysis of plaintiff's failure to inform claims must begin with ERISA's "comprehensive set of reporting and disclosure requirements" set forth in Part I of ERISA. *See Curtiss-Wright Corp. v. Schoonenjongen*, 514 U.S. 73, 83 (1995) (citing 29 U.S.C. §§ 1021-31). These requirements obligate fiduciaries to provide to participants a wealth of information concerning both the plan's governance and its financial position. For example, ERISA requires the plan administrator to produce a Summary Plan Description setting forth information pertaining to a plan's governance, including such information as: the names and addresses of those people or organizations exercising authority over the plan, descriptions of the plan's eligibility requirements, and the source of the plan's financing. *See* ERISA §§ 102(b), 104(b), 29 U.S.C. §§ 1022(b), 1024(b). In addition, ERISA requires that plan administrators make available to participants detailed financial information concerning the assets and liabilities of the plan, as well as its revenues and expenses over each year. *See* ERISA § 103, 29 U.S.C. § 1023. Thus, ERISA protects the interests of plan participants by explicitly providing for the disclosure of specific information by the plan administrator to participants.

Plaintiff does not contend that Fiduciary Counselors failed to comply with these explicit

-13-

requirements, but argues instead that ERISA § 404(a)'s standard of prudence creates further obligations for the disclosure of information to participants.  In view of the substantial disclosure obligations imposed expressly by ERISA, courts, in general, have been unwilling to read other provisions of ERISA, including § 404(a), as creating an implicit duty to disclose additional information. As the Supreme Court has noted, the disclosure requirements of ERISA Part I "may not be a foolproof informational scheme, although it is quite thorough.  Either way, it is the scheme that Congress devised.  And we do not think Congress intended it to be supplemented by a faraway provision in another part of the statute . . . ." *Schoonenjongen*, 514 U.S. at 84.  Similarly, the Fourth Circuit has refused to use § 404(a) to supplement ERISA's disclosure requirements based on the principle that specific provisions within a statute govern its general provisions and that this principle has "'special force with regard to a reticulated statute such as ERISA.'" *Faircloth v. Lundy*, 91 F.3d 648, 657 (4th Cir. 1996) (quoting *Bigger v. American Commercial Lines*, 862 F.2d 1341, 1344 (8th Cir. 1988)).  Thus, compliance with the express disclosure requirements of ERISA will generally satisfy a fiduciary's duty to provide information to participants.[7]

There are, however, narrow circumstances in which a fiduciary's general obligations under § 404(a) will trigger a further obligation to disclose information.  For example, courts generally

---

[7]*See, e.g., Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 105 (1st Cir. 2002) ("When ERISA itself has specified a duty and a corresponding remedy, we will impose a further duty on fiduciaries only in very narrow circumstances."); *Ehlmann v. Kaiser Foundation Health Plan of Texas*, 198 F.3d 552, 555 (5th Cir. 2000) ("Given the canon of statutory construction that the specific language in a statute rules the general, this court should not add to the specific disclosure requirements that ERISA already provides.") (internal citations omitted); *Sprague v. General Motors Corp.*, 133 F.3d 388, 406 (6th Cir. 1998) ("We are not aware of any court of appeals decision imposing fiduciary liability for a failure to disclose information that is not required to be disclosed."); Restatement (Second) of Trusts § 173 cmt. d (1959) ("Ordinarily the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information.").

recognize that a fiduciary is required to disclose information it possesses upon a participant's request. *See Griggs v. E.I. DuPont De Nemours*, 237 F.3d 371, 381 (4th Cir. 2001)(quoting *Faircloth*, 91 F.3d at 656); *see also*, Restatement (Second) of Trusts § 173 (1959).  Plaintiff does not contend that any Plan participant specifically requested from Fiduciary Counselors its views on the prudence of a continued investment in the Company Stock Fund, the current level of the cash target range, or the restrictions, if any, on its ability to sell US Air Group shares out of the Company Stock Fund independent of participant directions.  Therefore, Fiduciary Counselors did not violate its fiduciary duty by failing to respond to a participant request.

In addition, an affirmative duty to disclose information arises when a fiduciary is aware that participants are laboring under a material misunderstanding concerning the Plan or its benefits.[8] This duty is derived from the common law of trusts, which ERISA's fiduciary duty provisions incorporate,[9] and which imposes upon fiduciaries "a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which [the fiduciary] knows the beneficiary does not know and which the beneficiary needs to know for his protection . . . ."  *See* Restatement (Second) of Trusts § 173 cmt. d (1959).  Read expansively, this principle could require fiduciaries to disclose every piece of information that it is privy to which a participant could later claim would have been material to his investment decisions.  To interpret this trust principle in such a way, however, would be to render meaningless the detailed disclosure requirements of ERISA, and to subject fiduciaries to the onerous duty of disclosing every piece of information which might

---

[8]*Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 115 (1st Cir. 2002) ("A failure to inform is a fiduciary breach only where the fiduciary 'knew of the confusion [detrimental to the participant] generated by its misrepresentations or its silence.'") (quoting *UAW v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir.1999)).

[9]*See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989).

conceivably be useful to the participants' investment choices.  By including specific disclosure

requirements in the statute, Congress made clear that it did not intend such a result.

Therefore, the affirmative duty to provide information to participants of an ERISA plan

arises only when the fiduciary has fostered the misunderstanding of facts material to participants'

investment decisions.  Limiting § 404(a)'s disclosure requirements to instances in which the

fiduciary is correcting a misunderstanding it has fostered strikes the appropriate balance between a

fiduciary's duty of loyalty to plan participants with its need to clearly understand and comply with

ERISA's disclosure requirements.  Thus, in *Griggs v. E.I. DuPont De Nemours & Co.*, 237 F.3d

371 (4th Cir. 2001), the Fourth Circuit formulated the affirmative duty as follows:  "an ERISA

fiduciary that knows or should know that a beneficiary labors under a material misunderstanding of

plan benefits that will inure to his detriment cannot remain silent—especially when that

misunderstanding was fostered by the fiduciary's own material misrepresentations or omissions."

*Griggs*, 237 F.3d at 381.  In *Griggs*, the plaintiff had decided to retire early based on the assurances

of the defendant that he could roll over certain early retirement benefits on a tax free basis.  *Id.* at

375.  The defendant, Griggs' employer Dupont, had learned through its own calculations that this

was not in fact the case, but failed to inform Griggs before he took early retirement and suffered

adverse tax consequences.  *Id.* at 375-76.  On these facts, the Fourth Circuit held that DuPont had

violated its fiduciary duties under § 404(a) because it had first fostered and then failed to rectify

Griggs' misunderstanding.  *Id.* at 382.  Plaintiff's cited cases are entirely consistent with the *Griggs*

principle; they likewise impose upon a fiduciary an affirmative duty to inform participants of

information beyond that specifically required by ERISA only after the fiduciary has somehow

misled the participant.[10]

Yet this case is far from *Griggs*, for here plaintiff does not allege that Fiduciary Counselors had fostered any material misunderstanding among Plan participants.  The financial difficulties facing US Airways were well known to the investing public at large, and US Airways had repeatedly informed its employees of the possibility of a bankruptcy filing.  In fact, US Airways explained in a letter to participants that the appointment of Fiduciary Counselors was in contemplation of a possible bankruptcy filing's "impact upon the value of US Airways common stock."  Thus, Fiduciary Counselors had no reason to suspect that Plan participants were unaware of the risks of investing in US Air Group stock, nor did Fiduciary Counselors misrepresent the risks of investing in US Air Group stock.  In its letter of August 1, 2002, Fiduciary Counselors informed participants that in light of US Airways restructuring efforts it had concluded that "it is not prudent at this time to purchase additional shares of Common Stock for the [Company] Stock Fund."  Plaintiff's suggestion that this lone statement implied that "it was *prudent* for participants to continue to be invested in the Stock Fund as well as to make additional investments in the [Company] Stock Fund" is patently absurd.  At most, the statement reflects Fiduciary Counselors' considered judgment that considering the risks facing US Airways, the

---

[10]*See, e.g., Polaroid ERISA Litig.*, 362 F.Supp.2d 461, 477-79 (S.D.N.Y. 2005) (holding that plaintiff stated a claim for failure to inform by alleging that the defendants had "created an inaccurate impression of the future prospects of the Company. . . ."); *In re Electronic Data Systems Corp. ERISA Litig.*, 305 F.Supp.2d 658, 672-73 (E.D.Tex. 2004) (plaintiff stated a claim for failure to inform because defendant fiduciaries misled participants in 401(k) about risks of investment in company stock in its public filings); *In re CMS Energy ERISA Litig.*, 312 F.Supp. 2d 898, 916 (E.D.Mich. 2004) (defendants provided misleading information about soundness of company stock); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 284 F.Supp. 2d 511, 562 (S.D.Tex. 2003) (holding that plaintiffs stated claim by alleging that defendants had a duty to disclose the company's fraudulent accounting practices).

Company Stock Fund should limit its exposure by promptly ceasing to purchase any more US Airways stock for the Company Stock Fund.  If the statement implied anything to participants, it would be that they, too, should consider carefully the risks of investing in US Air Group Stock.

Nor did Fiduciary Counselors mislead plan participants in regard to its ability to sell shares of US Air Group on the open market in the absence of participant direction.  Sales of stock are subject to numerous legal constraints, which are a matter of public record.  To require disclosure to participants of every possible legal consideration faced by a fiduciary would be to risk confusing participants by burying a fiduciary's truly important disclosures in a mass of legal disclosures.  ERISA plainly does not require such disclosures.

Finally, plaintiff contends that Fiduciary Counselors breached its fiduciary duty by "failing to timely inform Participants that it had instructed Fidelity Trust not to purchase additional shares of [US Air] Group stock for the [Company] Stock Fund or inform them that it had instructed Fidelity to increase the cash target of the [Company] Stock Fund from 10% to 20%."  The allegation, therefore, is not that Fiduciary Counselors provided misleading information, but that they failed to inform participants of this instruction in a timely manner.  The complaint admits, however, that participants received this information by August 1, 2002 or roughly five weeks after its direction to Fidelity.  Several considerations compel the conclusion that this lag in time is not sufficient to state a claim for breach of fiduciary duty to disclose information.  First, ERISA's express provisions require disclosure of any "material modifications in the terms of the plan" or any changes in the information required by the Summary Plan description within 60 days of the modification.  29 U.S.C. § 1024(a)(2)(D).  Assuming that Fiduciary Counselors' direction to Fidelity represented a "material modification" of the Plan, the

disclosure was well within the 60 days required by ERISA.  *See Porto v. Armco, Inc.*, 825 F.2d 1274, 1276 (8th Cir. 1987) ("[A]n administrator who complies with the statutory standard for disclosure cannot be said to have breached the fiduciary duty by not providing earlier disclosure.").  Second, Fiduciary Counselors was bound by the terms of its engagement to allow US Airways to review and comment upon any communications between Fiduciary Counselors and Plan participants. This requirement supports the timeliness of Fiduciary Counselors' disclosure to Plan participants.  In view of these considerations, Fiduciary Counselors' disclosure of its directions to Fidelity to cease purchasing US Air Group stock and to increase the cash target range was made in a timely manner.

In summary, Fiduciary Counselor's duty to disclose information beyond that specifically required by ERISA is limited to instances in which they have fostered a material misunderstanding of Plan benefits or investment options and then failed to correct that understanding.  No such facts are alleged here.  Given this and because Fiduciary Counselors' disclosure to participants of its actions was timely, plaintiff's claims for failure to disclose information must be dismissed.

**B.**

Plaintiff's remaining allegations charge that Fiduciary Counselors acted imprudently with respect to the Company Stock Fund after it assumed responsibility for its management. Specifically, plaintiff alleges that Fiduciary Counselors failed to act "with the care, skill, prudence and diligence" of "a prudent man acting in like capacity and familiar with such matters," ERISA § 404(a), by: (i) failing to instruct Fidelity to close the Company Stock Fund to new investments, and by (ii) failing to instruct Fidelity Trust to sell as much stock as could be

sold subject to market and legal restrictions.

Courts considering ERISA's standard of prudence in the context of a fiduciary's investment decisions have appropriately held that the general fiduciary obligation of § 404(a) does not require prescience of fiduciaries, but instead measures a fiduciary's performance based on the facts then at their disposal.[11]  Thus, the appropriate benchmark with which to judge a fiduciary's behavior is an objective one "measured against the standards of the investment industry."  *Ulico Casualty Co. v. Clover Capital Mgmt., Inc.*, 335 F.Supp. 2d 335, 340 (N.D.N.Y. 2004).  Although fiduciary investment decisions with respect to retaining company stock are not entitled to a presumption of prudence, considerations of the inherent unpredictability of financial markets entitle a fiduciary's investment judgments to "substantial latitude," especially where, as here, there are no allegations of fraudulent conduct on the part of the fiduciary.  *See DiFelice v. U.S. Airways, Inc., et al.,* ___ F.Supp.2d ___, 2005 WL 2674994, * 21 n.15, 22 (E.D.Va. 2005). *See also In re Unisys Savings Plan Litig.*, 74 F.3d 420, 434-35 (3d Cir. 1996) ("[T]he prudence requirement is flexible, such that the adequacy of a fiduciary's independent investigation and ultimate investment selection is evaluated in light of the 'character and aims' of the particular type of plan he serves.") (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, (1984)).

The Department of Labor ("DOL") has provided further guidance on the application of the § 404(a) prudent man standard to a fiduciary's investment decisions.  According to the DOL, a

---

[11]*See Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994) ("the prudent person standard is not concerned with results; rather, it is a test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight.") (citations omitted); *DeBruyne v. Equitable Life Assurance* Soc'y, 920 F.2d 457, 465 (7th Cir. 1990).

fiduciary has satisfied "the prudent man" standard in relation to its investment duties if it:

> [h]as given *appropriate consideration* to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in the that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and . . . has acted accordingly.

29 C.F.R. § 2550.404a-1 (emphasis added). And according to the DOL, "[a]ppropriate

consideration" includes a "determination by the fiduciary that the particular investment course of

action is reasonably designed . . . to further the purposes of the plan, taking into consideration the

risk of loss and the opportunity for gain (or other return) associated with the investment . . . ." *Id.*

Factors to consider in this determination include:

> (i) the composition of the portfolio with regard to diversification; (ii) the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (iii) the projected return of the portfolio relative to the funding objectives of the plan.

*Id.* Thus, although a named fiduciary is not required to ensure the performance of a given plan

investment, a named fiduciary is required, at a minimum, to examine the characteristics of an

investment, including its risk characteristics and its liquidity, to ensure that it is an appropriate plan

investment, and that it is in the best interests of the plan participants.

Judged by this standard, Fiduciary Counselors' actions upon appointment as fiduciary as

alleged in the complaint cannot be held as imprudent. The facts alleged in the complaint reflect

that Fiduciary Counselors appropriately considered the relevant facts available at the time and

acted accordingly. At the time of Fiduciary Counselors' appointment, the shares of US Airways,

valued at $3.72 by the market, already reflected the significant risk of US Airways' bankruptcy.

*See Basic, Inc. v. Levinson*, 485 U.S. 224, 241-47 (1988) (employing the capital markets

hypothesis that stocks reflect all publicly available information and known risks).  Further, on July 10, 2002, US Airways announced that it had received the approval of a $900 million loan guarantee contingent upon US Airways' ability to secure concessions from its creditors, lessors and employees.  Had US Airways been successful in obtaining these concessions, its financial situation and share price might have improved dramatically.  The possibility that US Airways might avoid bankruptcy explains why the share price hovered around $3.00 throughout July of 2002 despite the well-known fact that US Airways might file for bankruptcy.

More importantly, Fiduciary Counselors did act promptly to mitigate the risks of a potential bankruptcy filing to the value of Plan assets held in the Company Stock Fund by directing Fidelity to cease purchasing shares of US Air Group stock on the public market for the Company Stock Fund and to begin gradually increasing the percentage of cash in the Company Stock Fund by selling US Air Group shares.  Thus, Fiduciary Counselors' decision to retain the Company Stock Fund as a Plan investment option did not increase the Plan's exposure to the risks of US Air Group stock.  Any additional investments in the Company Stock Fund by Plan participants during the proposed class period were simply held as cash.  In addition, closing the Company Stock Fund to new investments would not have affected the huge concentration of US Air Group shares already held by the Company Stock Fund.  Therefore, Fiduciary Counselors' decision to retain the Company Stock Fund as a Plan investment option did not directly contribute to any losses incurred by the Plan.

Furthermore, Plaintiff's allegation that Fiduciary Counselors acted imprudently by not directing Fidelity Trust to sell as many shares as possible ignores the likely negative impact such a dramatic sell-off would have on the price of the stock.  The daily trading volume during the

roughly seven weeks between Fiduciary Counselors' appointment and US Air Group's bankruptcy announcement ranged from 285,500 shares per day to 1,980,000 shares per day. The Complaint reflects the fact that when Fiduciary Counselors assumed control of the Company Stock Fund it held 22,945,832 shares for the various defined contribution plans of US Airways. Any attempt to unwind this position quickly would have resulted in a sharp decline in the price of the shares. Given the possibility that US Airways might avoid bankruptcy filing by securing employee concessions, Fiduciary Counselor's decision not to engage in a massive sell-off of the Company Stock Fund's holdings of US Air Group shares is well within the range of prudent conduct expected of a fiduciary.

Thus, the actions of Fiduciary Counselors in its capacity as independent fiduciary for the Company Stock Fund differ markedly both in degree and in kind from those taken (or not taken) by US Airways in the months prior to its appointment of Fiduciary Counselors. US Airways was the fiduciary with respect to the Company Stock Fund for the many months preceding the appointment of Fiduciary Counselors and took no action as the Company Stock Fund accumulated nearly a third of US Air Group's outstanding shares despite the airline's well known business and financial difficulties. In those circumstances, a jury could find that US Airways had failed to perform its duty with the care, skill, diligence and prudence of a prudent man. *See DiFelice v. U.S. Airways, Inc., et al.,* ___ F.Supp.2d ___, 2005 WL 2674994 *24 (E.D.Va. 2005). In contrast, Fiduciary Counselors was appointed to manage the assets of the Company Stock Fund roughly seven weeks prior to US Airways' bankruptcy announcement. It faced the unenviable task of attempting to mitigate the risks presented by the Company Stock Fund's already large position in US Air Group's shares in a market with little demand for those shares.

If Fiduciary Counselors sold shares too quickly it risked reducing the price and consequently diminishing the value of the Company Stock Fund's assets.  However, if Fiduciary Counselors waited too long to sell the Company Stock Fund's shares of US Air Group, it risked the loss of the value of the shares in a bankruptcy proceeding.  Because Fiduciary Counselors could not predict the timing of any possible bankruptcy filing, it therefore could not be expected to know the optimal price for which the Company Stock Fund's shares should be sold.   In response to this dilemma, Fiduciary Counselors directed Fidelity to stop buying shares on the open market and to sell the shares it then held in a careful and measured manner so as to avoid sparking a substantial decline in the price of the shares it still held.  Thus, given the difficult circumstances confronting Fiduciary Counselors at the time of its appointment and given the actions it took to protect the assets of the Company Stock Fund, a reasonable jury could not find that Fiduciary Counselors violated its § 404(a) duty to act "with the care, skill, prudence and diligence" of a "prudent man acting in like capacity and familiar with such matters." 29 U.S.C. § 1104(a).  Put another way, assuming the truth of the extensive facts plaintiff alleges, the complaint fails to state a claim under ERISA.  For this reason, defendant's motion to dismiss must be granted.  An appropriate order will issue.


_____/s/_____
Alexandria, VA                                              T. S. Ellis, III
November 8, 2005                                        United States District Judge


-24-